THE SUSSEX TRUST COMPANY, a corporation of the State of Delaware, Executor of the Estate of Stephen G. Pierce, deceased,

*vs.*

SAMUEL C. PIERCE, SR., and CAPE HENLOPEN SURF CLUB, a corporation of the State of Delaware.

*Sussex, February. 20, 1950.*

*James M. Tunnell, Jr.,* of the firm of Tunnell & Tunnell, for plaintiff.

*Frederick P. Whitney,* for defendant Samuel C. Pierce, Sr.

*David S. Keil,* of the firm of Keil & Keil, for defendant Cape Henlopen Surf Club.

SEITZ, Vice Chancellor: This is an action by an executor seeking to have the estate declared the real owner of stock held in the name of another person.

The defendant, Cape Henlopen Surf Club (hereinafter called the "corporate defendant" or the "corporation") was incorporated in Delaware in 1939. It leased certain land from the town of Lewes and placed a building thereon. It was necessary to revive another corporation known as Belle

Haven Surf Club in order to procure a liquor license. Pursuant to an agreement with the corporate defendant, Belle Haven Surf Club operated a private club on the land which the corporate defendant had leased.

The Belle Haven Surf Club started operations about September 1940. Some time in 1941 the federal government commenced condemnation proceedings with a resultant cessation in the Club's activities. Later the corporate defendant received a cash payment from the Government for the condemnation of the leasehold interest. This cash is the sole corporate asset and the sole reason for the present controversy.

Both the corporate defendant and the Belle Haven Surf Club were the creatures of either Stephen G. Pierce or his brother Samuel C. Pierce, Sr.

The Belle Haven Surf Club was operated by Stephen G. Pierce (hereinafter called the "deceased") who was killed in an accident on May 18, 1945. His brother Samuel C. Pierce, Sr. (hereinafter called "defendant") testified that he (the defendant) took no part in the operation of the Club. In fact, he was a full-time employee of the State Tax Department during this time. He also sold insurance as a side line.

The corporate defendant has only 100 shares of no par capital stock outstanding. Twenty-five shares were authorized to be issued to the defendant on April 15, 1940. The minutes containing the resolution authorizing such issuance were signed by the defendant as secretary. They recite that the stock "shall be sold" to Samuel C. Pierce, Sr. for the sum of $2,500.00, and "upon payment of said sum stock certificates for said number of shares shall be issued to him or his nominee." A certificate dated April 15, 1940, for 25 shares was issued to the defendant. It was signed by defendant as secretary and his son as president. The defendant testified that at various times from

1939 to April 15, 1940, he advanced $2,500.00 to the corporate defendant for its use. This entire $2,500.00 was advanced in cash from money which the defendant said he kept in his home. He said the money accumulated from his work as an employee of the State Tax Department and from certain commissions received by him, plus a previous accumulation of about $6,000.00. He stated that no receipts were given for the money; nor are there available any corporate records of such advances. According to defendant, it was this $2,500.00 which was used to pay for the first 25 shares.

The minutes of a meeting held on May 8, 1942, contain a resolution which recites that the proper officers of the corporate defendant were "authorized to issued [sic] in the name of Samuel C. Pierce, Sr.", 75 shares of the corporate defendant's stock, "said shares to be in lieu of the sum of Nine Thousand Five Hundred Ninety-seven and 39/100 Dollars". A stock certificate dated May 8, 1942, for 75 shares signed by the deceased as president and the defendant as secretary was offered in evidence.

The defendant, in answering certain interrogatories before trial, reiterated as late as January, 1949 that the 75 shares were issued for the $9,597.39 consideration.[1] However, at the trial he admitted that he did not give $9,000.00 plus in cash for the 75 shares. Instead, he testified that during the period from April 15, 1940, to May 8, 1942, he rendered services and advanced approximately $1,000.00 in cash to the corporation. The defendant also sought to justify the issuance of the 75 shares of stock to himself on the ground that the deceased took certain property belonging to the corporation and agreed that the corporate defendant was entitled to the sum aggregating $9,597.39. As hereinafter shown, assuming that this testimony was properly admitted, I am not inclined to accept it.

Plaintiff-executor contends that the evidence shows that

---

[1] He made the same answer in an earlier interrogatory.

the defendant never was the real owner of any of the stock, but held it for the deceased who sought thereby to prevent its possible seizure by his creditors. Plaintiff says that the evidence demonstrates that the defendant could not have advanced a total of $2,500.00 in cash to the corporation for the first 25 shares, and $1,000.00 in cash (plus services) for the remaining 75 shares. Defendant's contention that he received the 75 shares pursuant to an agreement with the deceased is apparently an alternative contention. Plaintiff urges that there is no admissible evidence of any such agreement.

The problem here is rendered particularly difficult because of the close relationship involved, the lack of adequate records and the fact that the deceased also signed one of the stock certificates. My conclusions must be based to a large extent on such probabilities as can reasonably be inferred from the situation generally.

Plaintiff showed the total income of the defendant during the years in question, and for a period of time prior thereto. This testimony indicated that the defendant never earned much over $2,000.00 a year, although he said he always saved cash. Moreover, he provided for a wife and three children. Of real importance, the plaintiff introduced credit statements signed by the defendant in which the defendant indicated that in 1937 he had only $165.00 in cash. A credit statement made out by the defendant in June of 1942 showed a cash position of $300.00. These statements fly directly in the face of his testimony that he always had several thousand dollars in cash. The uncontradicted evidence showed that continuously from 1928 through 1942, he owed one bank the sum of $2,500.00, and another bank in excess of $4,000.00. During this period he paid only $75.00 on the entire principal, although he did pay interest. The credit statements fail to reveal any other assets which would support defendant's testimony. Defendant did not attempt to explain this apparent incongruity though it

was suggested that he do so. While obviously not conclusive, this evidence is not to be ignored in considering whether the defendant advanced $3,500.00 in cash in a relatively short period of time.

The defendant admitted that he never got any receipts for any of the money advanced to his brother for the corporation, and he admitted that there are apparently no corporate records reflecting his advances, even though he was an official of the corporation during the years when the money was advanced.

The evidence which I have discussed leads me to conclude that the defendant did not have the cash available to make the advances which he states that he made. Moreover, there was testimony of other witnesses which supported plaintiff's contention. While most of these witnesses were "interested", one of them, who so far as shown, is not financially or otherwise interested, testified that she heard the deceased state that he wanted the defendant to have the stock because he wanted to protect his family and because he did not want the president of the bank, which was a large creditor, to know what he had or get what he had.

Another statement volunteered by the defendant from the witness stand is not without interest. He first admitted that the deceased put money into this project (and perhaps another) and then added that the deceased didn't want his family to get anything he had because of family trouble. This suggests to me that the deceased was perhaps placing the stock in defendant's name for more than one reason. The important thing is that it does not square with defendant's contention that he paid for all the stock. Moreover, defendant does not explain why the deceased would take such an active part in this enterprise and at the same time permit the defendant to be the 100% owner of the defendant corporation and a large owner in Belle Haven.

The defendant contends that the lack of records is explained by the close relationship which existed between the brothers. Conceding this to be so, the surrounding circumstances lead me to infer that the confidential relationship was used by the deceased as a device to disguise his interest in the venture.

The defendant contends that the 75 shares were issued to him for money advanced by him pursuant to an agreement with his brother relative to the Belle Haven Surf Club; defendant claiming that he was owed over $9,000.00 in this connection. Assuming the admissibility of this testimony, the defendant was very vague in his testimony concerning the alleged agreement. The minutes of the May 8, 1942 meeting at which the 75 shares were issued, and which minutes were signed by the defendant, do not make any reference to a separate agreement. They do not even mention the Belle Haven Surf Club. Moreover, the defendant could not explain the apparent inconsistency between his answer on interrogatory and his answer at the hearing with respect to the $9,597.39. Under the circumstances, I feel compelled to find that no such agreement existed.

The plaintiff, of course, has the burden of proof, but we must not lose sight of the fact that under plaintiff's theory the deceased as well as the defendant were acting in concert. Plaintiff has shown to my satisfaction that the defendant did not pay the corporation the recited consideration for the 100 shares of stock. With respect to the 75 shares defendant was caught in what must be viewed at best as a "negligently" misleading answer. Defendant suggested that he paid for the stock with money and by way of services. I find his testimony unconvincing in many respects. He was unable to explain substantial inconsistencies in his testimony. His earnings and assets are not consistent with his testimony as to the cash advances made by him. Also, he admitted on the witness stand that he did not even know some of the officers and directors of the

corporation, who were in office when he purportedly was the sole owner of the stock. Admittedly these men were asked to serve as directors by the deceased who in fact controlled the corporation.

Why did the deceased put the stock certificates in the defendant's name? I am inclined to believe he was making certain that his creditors would not be able to reach his interest. He was obviously in difficulties on his collateralized bank loans. He was indebted to one bank in the sum of about $15,000.00 in 1939 and this continued until 1942 when the bank was forced to sell some of the defendant's collateral. The situation existing in the period when the defendant received the stock certificates leads me to conclude that the deceased was attempting to place his interest beyond the reach of his creditors in the event some execution process was issued against him.

Although I have concluded that the recited consideration was not in fact given for the stock certificates, nevertheless, my conclusion on that point is not dispositive of the case. I feel that the admissible evidence given by the defendant is sufficient to support the conclusion that deceased and the defendant went into the venture together. The corporate aspect of the venture appears to have been incidental since formal meetings were rarely held. While the deceased managed the Belle Haven, he apparently received compensation for his efforts. On the other hand, the defendant while having not too much to do with the Belle Haven apparently rendered substantial aid in seeing that the clubhouse was placed on the leased property. It does not appear that he ever received compensation for his efforts. He was an official of the defendant corporation from 1939 to 1941. It is most reasonable to infer that the defendant did perhaps advance small sums of cash at the inception of the project because the deceased did not have much cash. It is vitally important to note that the defendant corporation really did nothing more than secure

a lease and place a building on the leased property. I feel that the defendant had as much to do with bringing this about as did the deceased. Consequently, I conclude that the defendant as well as the deceased had an interest in the corporation. There is nothing in the evidence to warrant the conclusion that this interest was other than equal.

It is my conclusion that in fact the corporate defendant was initially owned by the deceased and the individual defendant in equal shares. I do not believe that this interest changed. The outstanding certificates will be cancelled. The parties may want to consider whether the final judgment will provide for distribution rather than the issuance of new certificates.

An order accordingly will be entered on notice.